GARY M. RESTAINO
United States Attorney
District of Arizona

JOSEPH F. BOZDECH
California State Bar Number 303453
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Email: joseph.bozdech@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br>v.<br><br>Bank of America Cashier's Check #0853221661 in the amount of $380,000 remitted to the United States Marshals Service by James Ebert,<br><br>　　　　　　Defendant *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (Supplemental Rules):

## NATURE OF THE ACTION

1. This is a civil action in rem to forfeit property to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) because it is property involved in a transaction or attempted transaction in a violation of 18 U.S.C. § 1956, Money Laundering, with the intent to conceal the source, location, ownership, or control of proceeds of a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), including but not limited to Mail Fraud, Wire Fraud, and Bank Fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1344,

2. This is a civil action in rem to forfeit property to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes proceeds of a specified unlawful activity

as defined in 18 U.S.C. § 1956(c)(7), including but not limited to Mail Fraud, Wire Fraud, and Bank Fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1344.

3. Venue and jurisdiction is based upon 21 U.S.C. § 881(j) and 28 U.S.C. § 1355(b) and § 1395 as acts and omissions occurring in the District of Arizona give rise to this forfeiture action. This Court has jurisdiction. 28 U.S.C. §§ 1345 and 1355, and 18 U.S.C. § 981(h).

## THE DEFENDANT *IN REM*

4. The defendant consists of a Bank of America Cashier's Check #0853221661 in the amount of $380,000 remitted to the United States Marshals Service ("USMS") by James Ebert ("Defendant Property") on July 28, 2020. The Defendant Property is currently in the custody of the United States Marshals Service.

## INTRODUCTION

5. In July 2020, James Ebert ("Ebert") received three cashier's checks totaling $380,000. The funds used to purchase the cashier's checks were traced by investigators to funds fraudulently obtained from the U.S. Small Business Administration ("SBA"). Ebert, who fell prey to a romance scam, acted as a "money mule" in a scheme to launder the $380,000 by depositing it into his Bank of America account at the direction of who he believed to be a woman located in the United Kingdom. Ebert voluntarily turned over the Defendant Property to FBI agents after being alerted to the scam.

## BACKGROUND

### *EIDL and PPP Programs and Fraud*

6. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted on March 27, 2020, designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID –19 pandemic.

7. One source of funding and assistance was the SBA's COVID-19 Economic Injury Disaster Loan ("EIDL") program.

2

8. This federal SBA loan program supported small business' recovery from the COVID-19 disaster's economic impacts by providing accessible and borrower-friendly capital.

9. These long-term, low-interest, fixed-rate loans were meant to overcome the effects of the pandemic to businesses by providing working capital to meet operating expenses.

10. The borrowed funds were to be used to make regular payments for operating expenses, including payroll, rent, mortgage, utilities, and other ordinary business expenses, or to pay business debt.

11. Fixed interest rates for the loans ranged from 2.75 percent and 3.75 percent, and payments were deferred for the first two years. Borrowers were expected to repay their EIDL in full.

12. Qualifying businesses could borrow up to $2 million in assistance, and for amounts less than $200,000, no personal guaranty was required.

13. Another SBA program, called the Paycheck Protection Program ("PPL") differed from EIDLs, as its loans were not required to be repaid, and its purpose was to pay up to eight weeks of payroll costs and benefits.

14. According to a later investigation by the SBA's Office of Inspector General ("OIG"), up to $200 billion in potentially fraudulent EIDL and PPP loans were issued.

15. In all, the OIG estimated that at least an alarming 17 percent of all COVID-19 EIDL and PPP funds were disbursed to potentially fraudulent actors.

***International Fraud and Money Laundering Organization Investigated by FBI***

16. In 2020, FBI Baltimore Division began working jointly with the U.S. Secret Service and SBA OIG investigating a large money laundering ring operating across the United States.

17. The proceeds being laundered included stolen funds from romance frauds, business e-mail compromise ("BEC"), computer intrusions, and frauds related to Covid-19 and Cares Act Funding.

18. The investigation began as a result of a BEC that targeted a Delaware-based business. The FBI's investigation ultimately uncovered an international criminal enterprise with a money laundering network of co-conspirators using money mules across the United States.

19. In May 2020, federal investigators learned of a computer breach via BEC in which a customer was deceived into wiring $459,264.87 in funds to a fraudster.

20. This BEC investigation eventually resulted in the conviction of several individuals in January and February 2024 for Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h). *United States v. Lawal, et al.,* 1:22-CR-00011 (D. Del).

21. This BEC fraud scheme was just one of many frauds perpetuated by a West African Criminal Enterprise in which funds were stolen through fraud and laundered throughout the United States.

***Money Mules Connected to West African Criminal Enterprise***

22. In July 2020, based on the earlier investigation of the BEC fraud described above, a Confidential Human Source identified Stephen Lynn Hynum ("Hynum") of Hawaii as a money mule.

23. Money mules are persons who transfer or move illegally acquired money on behalf of another. Money mules add layers of transfers between victims and criminals, making it more difficult for law enforcement to accurately trace the proceeds of crime.

24. While some money mules are professionals and know that they are supporting criminal enterprises, other money mules may be unwitting and victims themselves of fraud. Money mules are frequently victims of romance frauds in which they are deceived and manipulated into believing a fake boyfriend or girlfriend has a personal and romantic interest in them.

25. Unwitting money mules often unintentionally help large criminal organizations launder money.

26. Through investigation it was learned that Hynum had fallen victim to romance fraud and was depositing, then sending, funds to others at the direction of an online fraudster connected to a West African Criminal Enterprise.

27. Hynum admitted to investigators that he had deposited funds into his bank then sent several cashier's checks to Ebert at the direction of his online girlfriend.

### Ebert E-mails and Interview

28. On July 19, 2020, investigators contacted Ebert by phone and requested information regarding his bank accounts.

29. In response, Ebert sent an e-mail to the FBI investigators. He said he met his girlfriend Brandy A. Clark ("Clark") on ConnectingSingles.com and that they communicated via WhatsApp.

30. He said before he met Clark he had two bank accounts at Chase Bank. He said both accounts were closed before he deposited money into them.

31. He said he then opened two bank accounts at Wells Fargo Bank (one business and one personal) and that Clark deposited about $92,000 into one of the accounts. He said Wells Fargo closed that account and was holding the money.

32. Later investigation showed the $92,000 that was wired into Ebert's Wells Fargo business account came from fraudulently obtained Cares Act unemployment funds paid by the State of Massachusetts.

33. Ebert provided the photos in his e-mail to FBI investigators, including photos of a CU Hawaii FCU Cashier's Check in the amount of $145,000 payable to Ebert and a FedEx package from Hynum to Ebert.

34. Ebert also provided images of three cashier's checks, one each from Francis Rayburn ("Rayburn"), Michael Benson ("Benson"), and Richard Zull ("Zull").

35. On July 28, 2020, investigators met with and interviewed Ebert in Phoenix, Arizona.

36. Ebert reiterated that he was in an online relationship with Clark. Ebert said he invited Clark to attend the meeting, but she did not show up. Ebert said he opened a

5

Bank of America account at the direction of Clark. Ebert also admitted to receiving multiple checks from several money mules identified in the investigation and depositing those checks into multiple bank accounts.

37. Ebert provided further information regarding the three cashier's checks from Rayburn, Benson, and Zull.

38. On July 10, 2020, Ebert received a Farmer Bank Cashier's Check from Rayburn payable to Ebert in the amount of $135,000.

39. On July 11, 2020, Ebert received a Wells Fargo Cashier's Check from Benson payable to Ebert in the amount of $135,000.

40. On July 16, 2020, Ebert received an Honor Credit Union Cashier's Check from Zull payable to Ebert in the amount of $110,000.

41. Ebert admitted that all three cashier's checks were deposited into his Bank of America account.

42. According to later investigation by the FBI, the three cashier's checks described above were purchased with funds traced to fraudulent EIDLs.

43. In each case fraudsters would utilize stolen or false identifying information to obtain funds from EIDLs.

44. As set forth in more detail below, each EIDL was deposited in an account opened under a different name from the person or entity requesting the loan.

45. The email addresses used to submit the EIDL applications in each case had no clear connection to the business in whose name the EIDL was sought.

46. The addresses associated with the applications each appeared to be residential, while the name of each business indicates that it is a farming business.

47. Ebert voluntarily turned Defendant Property over to FBI. These funds represented the combined total of the three cashier's checks listed above that he received from Rayburn, Benson, and Zull.

***Farmers Bank Cashier's Check to Ebert from Rayburn***

48. On July 5, 2020, an application for an EIDL in the name of Daniel Brink, dba Brins Farms, 11132 West Talon Circle, Milwaukee, WI 53228, was submitted and subsequently approved. Loan 8667018009 in the amount of $150,000 was deposited into Farmers Bank account 1424947, held in the name of Francis Rayburn.

49. On July 10, 2020, Ebert received a Farmer Bank Cashier's Check from Rayburn payable to Ebert in the amount of $135,000.

50. Ebert admitted that he deposited the $135,000 Farmer's Bank Cashier's Check from Rayburn into his Bank of America account. When informed he had been the victim of romance fraud and was being utilized as a money mule to launder stolen funds, Ebert voluntarily agreed to turnover $135,000 constituting a portion of the Defendant Property.



***Wells Fargo Bank Cashier's Check to Ebert from Benson***

51. On July 1, 2020, an application for an EIDL in the name of Troy Wren, dba WRE Farms, 2961 Highwall Way, Columbus, OH 43221 was submitted and subsequently approved. Loan 7668758005 in the amount of $135,000 was deposited into Wells Fargo Bank account 1245817729, held in the name of Michael C. Benson.

52. On July 11, 2020, Ebert received a Wells Fargo Cashier's Check from Benson in the amount of $135,000.

53. Ebert admitted that he deposited the $135,000 Wells Fargo Bank Cashier's Check from Benson into his Bank of America account. When informed he had been the

victim of romance fraud and was being utilized as a money mule to launder stolen funds, Ebert voluntarily agreed to turnover $135,000 constituting a portion of the Defendant Property.



***Honor Credit Union Cashier's Check to Ebert from Zull***

54. On July 8, 2020, an application for an EIDL in the name of Roger Jubas, dba Jubas Farms, 226 North Water Street, Apartment 403, Milwaukee, WI 53202 was submitted and subsequently approved. Loan 1067538104 in the amount of $150,000 was deposited into Honor Credit Union account 1304680001, held in the name of Richard Zull.

55. On July 16, 2020, Ebert received an Honor Credit Union Cashier's Check from Zull payable to Ebert in the amount of $110,000.

56. Ebert admitted that he deposited the $110,000 Honor Credit Union Cashier's Check from Zull into his Bank of America account. When informed he had been the victim of romance fraud and was being utilized as a money mule to launder money, Ebert voluntarily agreed to turnover $110,000 constituting a portion of the Defendant Property.



### *Ebert's Cooperation*

57. Based on the images of, and statements about, the additional cashier's checks and packages received by Ebert, investigators recognized some of the persons who sent additional checks to Ebert as money mules for a West African Criminal Enterprise.

58. Ebert also e-mailed investigators copies of banking information Clark had given him via his phone and lengthy text records of intimate or romantic WhatsApp conversations he had with her over a three-month period.

59. Ebert said he did not want any trouble with the FBI.

60. Ebert said he had two children and a good relationship with his ex-wife, who worked for the Arizona Department of Public Safety.

61. He said he did not want them to find out about him being duped into a romance fraud or being a money mule and launderer.

9

### *WhatsApp Messages Between Ebert and Clark*

62. According to investigators, a review of Ebert's WhatsApp message conversations with the romance fraudster showed he was making financial transactions at the direction of Clark, and that he had a romantic attachment to her.

63. From May 2, 2020 to July 28, 2020, they exchanged messages on a daily basis. Clark and Ebert would say they loved each other and repeatedly referred to each other as "love," "babe," "darling," "sweetie," and "dear." Clark would often say she missed Ebert and send him pictures. Ebert said he wanted to buy a house with Clark. Clark lamented that she could not travel to him because of COVID-19 restrictions.

64. They would frequently exchange messages about financial transactions. Clark would send Ebert messages about cashier's checks he would be receiving, what bank accounts she wanted him to open, and where he should deposit the cashier's checks.

65. Clark would also send Ebert specific financial information for bank accounts where she wanted him to wire money.

66. Clark said she was doing all the financial transactions so she could invest in Bitcoin and have the money to travel with Ebert and enjoy life.

67. Ebert said he wanted to buy an Audi with the Bitcoin they would have.

68. Occasionally Clark would instruct Ebert to take some money out of the accounts for himself to spend.

69. On May 19, 2020 Ebert messaged to Clark "[o]kay this way it makes me really upset because of the second bank account that a fraud department has got involved with and now I've lost that bank account so no more money wire transfers no more mixing funds or whatever I'm done I you know this is you know every account that I've given you has been closed due to something so I'm done with it you know why I can't go around opening bank accounts at every Bank in town and then when you start doing something to him they get enough closing and it hurts my credit and hurts my reputation it that's not the way things go so no more I'm done."

70. He continued "I am so pissed off right now it's not even funny a good relationship with Chase that got all f***** up my Wells Fargo are all f***** up I'm completely done I don't want to do this you know this isn't right by any stretch of the imagination."

71. Clark placated Ebert and reassured him that he had done nothing wrong and that the banks were only being difficult because her requested transactions were international.

72. She apologized for the financial strain it was causing him and he accepted her apology.

73. A few days later he asked her for money for his personal use, and she said she would send him money via Walmart.

74. She again apologized that all his accounts had been closed, but he said it was OK, because he was able to open up new accounts at Bank of America.

75. Walmart would not allow Ebert to retrieve a transfer from Clark.

76. Ebert messaged Clark "[y]eah the money you sent through the Walmart card is not letting me pick up the money as saying there's fraud on the account I I don't know what to say I just spent 35 minutes in Walmart and they're having me call the fraud department and when I did it said that it's a fraudulent thing I don't know."

77. He continued "[y]ou know I don't even worry about sending me any more money it it's not worth the fustration whatever money was sent through Walmart and just have you go back or whoever set it go back and get it and cancel the transaction I'll figure something out" and "[d]on't send me any more money everything it sent it just comes back as fraud so and I can't deal with that anymore so please don't send me any more money".

78. This pattern of questionable activity continued throughout the three-month time period reflected in the WhatsApp Messages provided by Ebert. Clark would have cashier's check sent to him, Ebert would deposit them and make transfers, and his accounts would eventually get closed for suspicious activity. Clerk would apologize and give an excuse, and Ebert would forgive Clark and receive additional cashier's checks.

79. In the investigators training and experience, it is common for those involved in romance frauds to become willfully blind and assist with illegal behavior, even when they seemingly become aware of it, or reasonably should.

80. According to the investigators, Ebert's three-month WhatsApp messages showed he was a money mule for a West Africa Criminal Enterprise.

### *Administrative Forfeiture*

81. On July 28, 2020, FBI agents took possession of the Defendant Property.

82. On September 24, 2020, the FBI sent notice of the administrative forfeiture by certified mail to Ebert and published notice of the pending forfeiture.

83. Ebert did not file a claim or petition by the administrative deadline of October 29, 2020, and no other claims were filed. However, a declaration of administrative forfeiture was never entered.

84. On April 12, 2024, after a review of the file, the FBI sent notice of the pending forfeiture to Ebert by certified mail a second time.

### *Ebert's Administrative Claim*

85. On May 3, 2024, Ebert electronically filed an administrative claim to the Defendant Property.

86. When asked in the claim document what his interest in the Defendant Property was Ebert wrote that "[t]his money was taken from me it was from inheritance."

87. When asked in the claim to list any documents you are including to support your claim to the Defendant Property, Ebert wrote "[b]ecause it was from my inheritance. I was going to use it to buy myself a home."

88. Ebert did not supply any documents showing the existence of any inheritance.

### **SUMMARY**

89. The following are some of the factors that show the Defendant Property was involved in a transaction or attempted transaction of Money Laundering with the intent to carry out Mail Fraud, Wire Fraud, and/or Bank Fraud, and is property which

constitutes or is derived from proceeds traceable to Mail Fraud, Wire Fraud, and/or Bank Fraud:

a. The connection between criminal prosecutions and convictions in Delaware involving a West African Criminal Enterprise and a Confidential Human Source and the funds received by Ebert, including:

   i. A Confidential Human Source identifying Hynum as a money mule of the West African Criminal Enterprise;

   ii. Hynum's admission he was a money mule, was victimized through a romance fraud, and sent multiple cashier's checks to Ebert at the direction of his fake girlfriend;

   iii. Ebert supplying copies of cashier's checks from suspected money mules, including Hynum;

b. Ebert supplying copies of mailing materials from suspected money mules;

c. Ebert admitting that he had opened banks accounts, deposited questionable cashier's checks, and wired funds all at the direction of Clark;

d. Ebert providing a copy of a cashier's check for $92,000 that came directly from a defrauded CARES account unemployment payment made by the State of Massachusetts;

e. Ebert providing copies of three cashier's checks totaling $380,000 from three separate money mules (Rayburn, Benson, and Zull, who issued checks from Farmers Bank, Wells Fargo Bank, and Honor Credit Union, respectively);

f. Ebert admitting that he deposited the three cashier's checks totaling $380,000 into his Bank of America account;

g. FBI tracing the three cashier's checks totaling $380,000 to three fraudulent SBA EIDLs;

    h. Ebert voluntarily agreeing to return the defrauded $380,000 funds from the three cashier's check to the USMS in the form of a cashier's check (the Defendant Property);

    i. Ebert stating that he did not want his ex-wife or children to find out he was duped into a romance fraud and was a money mule;

    j. Ebert's numerous WhatsApp messages over a three month period detailing a likely romance fraud; and

    k. Ebert stating to Clark repeatedly that his bank accounts were being closed for fraud because of what he believed was suspicious and illegal activity.

## FIRST CLAIM FOR RELIEF

The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 89 as if fully set forth herein.

The Defendant Property is property involved in a transaction or attempted transaction in a violation of 18 U.S.C. § 1956, Money Laundering, with the intent to conceal the nature, source, location, ownership, or control of proceeds of a specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), including but not limited to Mail Fraud, Wire Fraud, and Bank Fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1344, and therefore is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## SECOND CLAIM FOR RELIEF

The United States realleges, readopts, and reincorporates all the allegations contained in paragraphs 1 through 89 as if fully set forth herein.

The Defendant Property is property which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, as defined in 18 U.S.C. § 1956(c)(7), and therefore is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that process issue for an arrest warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment

be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 1st day of August, 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

*/S/ Joseph F. Bozdech*
JOSEPH F. BOZDECH
Assistant United States Attorney